EDWARD R. LEMBO *vs.* ROBERT WATERS.

Middlesex.    February 14, 1973. — April 13, 1973.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Contract,* For sale of real estate, Construction, Performance and breach. *Evidence,* Extrinsic affecting writing.

Under an agreement for the purchase and sale of real estate on which the buyer intended to construct and operate a nursing home, providing for payment of the purchase price by a deposit, a larger sum "at the time of the delivery of the deed in cash," and the balance by a secured note "payable in or within fifteen months from the date of final state approval," and stating that the deed should "be delivered within

sixty days of the date of this agreement provided nevertheless that all necessary extensions shall be granted for purposes of obtaining necessary state permits, and approvals," and reciting that "the performance of this agreement is conditioned on the buyer obtaining all necessary state permits and approvals" which he agreed to "exert every diligent effort to obtain," it was held that the parties did not intend the time for performance to be subsequent to the construction and operation of the nursing home. [229-233]

Uncertainty as to what specific State permits and approvals were contemplated by the parties to an agreement for the purchase and sale of real estate on which the buyer intended to construct and operate a nursing home necessitated resort to the conduct of the parties, and where it appeared that on a certain day the seller was told by the buyer that he had obtained site plan approval from the Department of Public Health and that nothing stood in the way of completion of the agreement, and that thereafter the buyer did nothing to obtain additional State permits and approvals, it was held that the parties intended that the performance of the agreement would commence when the site approval was obtained, and that the buyer's refusal then to complete the agreement was an unjustified breach thereof. [233-234]

BILL IN EQUITY filed in the Superior Court on March 17, 1967.

The suit was heard by *Moynihan, J.*

*Harold W. Weisman* (*Christopher A. Moser* with him) for the defendant.

*Elliot M. Goodman* for the plaintiff.

HALE, C.J.   This suit in equity was originally brought by the plaintiff to obtain specific performance of a contract by which the defendant had agreed to purchase and the plaintiff had agreed to sell a parcel of land and a building located in Natick. After the institution of the suit, the property was sold to others. The plaintiff has filed a substitute bill of complaint by which he seeks to recover damages for the alleged breach of the contract by the defendant. The defendant's answer to the bill of complaint contains a counterclaim by which he seeks the return of the sum of $2,000 which had been paid to the plaintiff as a deposit. A Superior Court judge entered a decree ordering the defendant to pay damages with interest. The decree further ordered the counterclaim dismissed. The defendant

appealed, and the case is before us with a full report of the evidence and a report of material facts.

We summarize the facts found by the judge, which are fully supported by the evidence, together with additional facts which we ourselves find. The plaintiff was the owner of a parcel of land in Natick on which was located a dilapidated, unoccupied wooden building. The area of the parcel was 32,686 square feet. It was located in a general residence zone, and a special permit had been issued by the board of appeals of Natick permitting the property to be used as the site of a nursing home. The plaintiff, an attorney at law, had a real estate broker's license and was experienced in the acquisition, ownership, and sale of property. He was also familiar with the rules and regulations pertaining to the construction and operation of nursing homes. The defendant was in the real estate and restaurant business and, prior to 1966, had operated two nursing homes. Both the defendant and the plaintiff were acquainted with one Hill Trube and one E. L. Dahlquist. Both Trube and Dahlquist had experience with the establishment and operation of nursing homes. The defendant learned that the plaintiff was looking for a purchaser for his property and, prior to August 9, 1966, he communicated with the plaintiff with respect to purchasing it. The defendant had spent several hours with Trube examining the parcel and exploring its feasibility as the site of a nursing home. On August 9, 1966, the plaintiff and the defendant executed a purchase and sale agreement for this parcel.[1] A $2,000 deposit was paid. Thereafter, Trube took

---

[1] That agreement states in pertinent part:

"6. PURCHASE PRICE: The agreed purchase price for said premises is $46,800.00 dollars, of which $2,000.00 have been paid as a deposit this day and $8,000.00 are to be paid at the time of delivery of the deed in cash, and a note for $36,800.00 without interest and secured by a real estate mortgage or mortgages payable in or within fifteen months from the date of final state approval.

"7. TIME FOR PERFORMANCE; DELIVERY OF DEED: Such deed is to be delivered within sixty days of the date of this agreement provided nevertheless that all necessary extensions shall be granted for purposes of obtaining necessary state permits, and approvals."

"17. BUYER'S DEFAULT; DAMAGES: If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages unless within thirty days after the time for

steps to obtain from the Division of Nursing Homes of the
Department of Public Health approval of the parcel as a
site for the proposed construction of a nursing home.[2] On
October 17, 1966, the plaintiff wrote to the defendant
notifying him that he was in breach of the agreement and
that, under clause 17 of the purchase and sale agreement,
the plaintiff, as seller, would not accept the $2,000 deposit
as complete liquidated damages. An approval of the site for
the proposed construction of a nursing home was obtained
by letter of the Division of Nursing Homes dated December
15, 1966. This approval was stated by the Division to be
contingent upon: "5. Submission of your financial com-
mitment for construction prior to the approval of final
plans. 6. Completion of construction by the original spon-
sors. 7. Commencement of construction within six months
from the date of final approvals." This letter of approval
was addressed to Trube. The defendant was notified of the
fact of this approval.

On December 21, 1966, the defendant told the plaintiff
that he had received a copy of the site plan approval from
the Department of Public Health and that nothing stood in
the way of the completion of the agreement. The defendant
asked the plaintiff to contact the defendant's brother,
Oscar Wasserman, an attorney at law. The plaintiff wrote
to Mr. Wasserman suggesting the passing of papers on
January 9, 1967. He did not receive a response from Mr.
Wasserman. The defendant thereafter told the plaintiff
that he was no longer interested in purchasing the property

---

performance of this agreement or any extension hereof, the SELLER otherwise
notifies the BUYER in writing."

"25. ADDITIONAL PROVISIONS: The performance of this Agreement is condi-
tioned on the buyer obtaining all necessary state permits and approvals for the
construction and operation of a nursing home with a minimum of eighty beds and
the buyer agrees to exert every diligent effort to obtain said permits."

[2] It appears from the evidence that Trube and Dahlquist had agreed to aid the
defendant in securing necessary permits and approvals. While this arrangement
has been described as a "turnkey operation," the exact duties to be undertaken by
Trube and Dahlquist pursuant to this arrangement are not clear. In any event,
they were not parties to the contract now under consideration, and their role in
connection with it does not modify or explain our eventual construction of its
terms.

because it was not a good site for a nursing home. He was dissatisfied because there was an automobile sales agency across the street and also because he had heard that someone was going to construct a gasoline service station nearby.

On January 16, 1967, the plaintiff wrote to the defendant again advising him that he would not accept the $2,000 deposit as liquidated damages and that he, the plaintiff, insisted upon performance of the agreement. The plaintiff at all material times prior to the commencement of this suit was ready, willing, and able to complete the agreement in accordance with its terms. The judge found that the failure to obtain additional State permits and approvals was not the reason for the defendant's nonperformance and that the defendant did not go forward with the purchase because he was unable to obtain satisfactory financing commitments to enable him to complete the purchase and the construction of the building. The judge further found that the defendant never requested of the plaintiff that the time for the performance of the contract be extended for the purpose of obtaining additional State permits and approvals, and that, apart from relying on Trube to obtain the site approval, the defendant did not exert every diligent effort to obtain the necessary State permits and approvals.

We have examined this contract with due regard for the rule that the intention of the parties, drawn from the entire instrument, is to be ascertained. "So far as reasonably practicable it should be given a construction which will make it a rational business instrument . . . ." *Waldo Bros. Co.* v. *Platt Contracting Co. Inc.* 305 Mass. 349, 355, quoting *Bray* v. *Hickman,* 263 Mass. 409, 412.

The defendant relies on the provisions of clause 25 of the contract which conditions the buyer's performance on his obtaining "all necessary state permits and approvals for the construction and operation of a nursing home . . . ." He argues that not all the necessary permits and approvals contemplated by clause 25 were obtained and that he was not obliged to perform until all State approvals were obtained. In particular, the defendant argues that one of

the necessary permits, a permit for occupancy, could not have been obtained until after the construction of a nursing home had been completed and that the site approval, issued by the Division of Nursing Homes, was only conditional and, therefore, should not be considered a "necessary State permit" unless or until it should become final. Thus, the defendant interprets clause 25 to mean that a nursing home must be fully erected, equipped, and operational before it is possible to secure "all necessary State permits and approvals."[3]

Our consideration of the relevant contractual provisions leads us to conclude that the condition for performance is not as broad and encompassing as the defendant urges. The particular words of clause 25 are not entitled to special emphasis, "but they must be given such effect as a fair construction of the entire contract shows the parties intended they should have." *Central Trust Co.* v. *Rudnick,* 310 Mass. 239, 244. We regard the defendant's construction of clause 25 as inconsistent with two other contractual provisions. Clause 7 sets the time for performance as the delivery date of the deed "with all necessary extensions." Clause 6 provides that, at the time of the delivery of the deed, $8,000 is to be paid in cash and $36,800 is to be paid by a note, secured by one or more real estate mortgages (payable "within fifteen months from the date of final state approval"). Reading these two clauses in conjunction with clause 25, it is clear that the time for performance, which is also the time for delivery of the deed, is not contemplated as the date of final State approval since the payment provision treats those as different dates. Further, under clause 7 the parties agreed that the date of delivery of the deed, unless extensions were granted, would be "within sixty days of the date of this agreement." The parties could not

---

[3] We cannot ascertain from the evidence what "State permits and approvals," other than the one already obtained, were needed for the construction of a building to be operated as a nursing home, nor can we ascertain what additional State permits and approvals would have been "necessary" before a nursing home could be operational and fully licensed. The burden of proving what additional State permits and approvals were necessary was on the defendant.

have contemplated that a nursing home would be constructed and fully operational, with all appropriate permits and approvals, within this period of sixty days. The defendant's construction of clause 25 is thus inconsistent with the more limited and specific provisions of clauses 6 and 7. "If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former." Corbin, Contracts, § 547, p. 176. We conclude, therefore, that the parties did not intend the time for performance to be subsequent to the construction and operation of the nursing home.

We have limited the defendant's construction of clause 25 to require something less than all State permits and approvals necessary for a fully erected, equipped, and operational nursing home. Nevertheless, we remain uncertain as to what specific State permits and approvals were contemplated by the parties under this limiting construction (see fn. 3). To enable us to understand the subject matter of the agreement, to the extent it is doubtful or ambiguous, we resort to the conduct of the parties to determine "the meaning that they themselves put upon any doubtful or ambiguous terms . . .." *Rizzo* v. *Cunningham,* 303 Mass. 16, 21. See *Cetrone* v. *Paul Livoli, Inc.* 337 Mass. 607, 609. The defendant's conduct on December 21, 1966, aids us in this task. Prior to that day, on December 15, 1966, the defendant knew that approval of the parcel as a site for the proposed construction of a nursing home had been secured through the Division of Nursing Homes. On December 21, the defendant told the plaintiff that he had received a copy of a site plan approval from the Division and that nothing stood in the way of completion of the agreement. The plaintiff thereupon proposed that papers be passed on January 9, 1967. It appears that the defendant believed that the time for performance of the contract had then arrived and that the site approval which had been obtained was sufficient to satisfy the requirements of clause 25. This conclusion is supported by the defendant's

failure to seek extensions of the time for performance for the purpose of obtaining any additional State permits and approvals. Where parties act on a particular construction of a written instrument, "such construction will be of great weight and will usually be adopted by the court." *Canadian Club Bev. Co.* v. *Canadian Club Corp.* 268 Mass. 561, 569. *C. K. Smith & Co. Inc.* v. *Charest,* 348 Mass. 314, 319. We conclude that the parties intended that the performance of the contract would commence when the site approval was obtained.

Even if we regarded the defendant's construction of the contract as persuasive, his failure "to exert every diligent effort to obtain said permits" was in breach of clause 25 since, as the judge found, the defendant did nothing to obtain additional approvals prior to the time he notified the plaintiff that he would not complete the contract.

We conclude that the defendant, without legal justification, failed to perform the contract and committed a breach thereof.

*Decree affirmed.*